# United States Court of Appeals
## For the First Circuit

No. 14-1535

NORMA IRIS MIRANDA-RIVERA; THE ESTATE OF CHRISTOPHER ROJAS
MIRANDA; NANCY I. TRINIDAD-TORRES, on behalf of her minor child
C.Y.R.T.,

Plaintiffs, Appellants,

GABRIEL ROJAS-PIRIS,

Plaintiff,

v.

PEDRO TOLEDO-DÁVILA, Superintendent, Police of Puerto Rico;
MIGUEL RODRÍGUEZ-CRESPI, Sergeant; WILLIAM PÉREZ-SOTO, Police
Officer,

Defendants, Appellees,

ANIBAL ACEVEDO-VILA, Governor for the Commonwealth of Puerto
Rico; ROBERTO SÁNCHEZ-RAMOS, Secretary of Justice, Commonwealth
of Puerto Rico; ORLANDO RIVERA-LUGARDO; JUAN JOSÉ TOLEDO-
BAYOUTH; JOSÉ TOLEDO-BAYOUTH; FERNANDO TOLEDO-BAYOUTH; PEDRO J.
TOLEDO-BAYOUTH; JOHN DOE, Police Officer, Toa Baja; INSURANCE
COMPANY ABC, INC.; RICHARD ROE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel E. Domínguez, U.S. District Judge]

Before

Barron, Hawkins,* and Lipez,
Circuit Judges.

---

Pedro R. Vázquez, III, with whom José F. Quetglas Jordan was on brief for appellant.

Susana I. Peñagarícano Brown, Assistant Solicitor General, with whom Margarita L. Mercado-Echegaray, Solicitor General, was on brief for appellees.

---

February 12, 2016

---

*  Of the Ninth Circuit, sitting by designation.

**HAWKINS**, **Circuit Judge**.  Christopher Rojas Miranda ("Rojas") was arrested by Puerto Rico Police Department ("PRPD") officers for driving under the influence.  Shortly after they brought him to the police station, he died in a holding cell.  His family members and estate brought suit under 42 U.S.C. § 1983, alleging that the arresting officers used excessive force against Rojas and denied him needed medical care.  The district court granted summary judgment on these claims on insufficient evidence and qualified immunity grounds.  We affirm in part and reverse and remand in part.

## I.  Background

### A. Facts

At around 8:20 p.m. on April 10, 2007, PRPD officers William Pérez Ortiz ("Pérez") and Orlando Rivera Lugardo ("Rivera") observed Rojas driving at a high speed, running stoplights, and swerving.  They chased him in their patrol car until he stopped at the side of the road.  At their direction, Rojas exited his car and put his hands on the trunk of the car. Pérez asked Rojas if he was all right and began explaining why they stopped him.  At first, Rojas did not respond, but then, keeping his hands on the trunk and looking everywhere, he began screaming that a car was following him and that someone was trying to kill him.  As Rojas continued to scream and began using foul

-3-

language, Pérez reached for his handcuffs. Rojas turned around abruptly and knocked Rivera's portable radio out of his hands.

There was then a brief scuffle between Pérez, Rivera, and Rojas. All three fell to the ground. Rojas hit the ground with his chest or stomach. Pérez cuffed Rojas's hands behind his back as Rojas was prone on the ground. He then let Rojas sit up and Rojas sat calmly for a little while as Rivera radioed for assistance. As other officers came on the scene, Rojas again began screaming in foul language that someone wanted to kill him. Pérez, Rivera, and a third officer then put Rojas into Pérez's patrol car. Rojas tried to put his legs up against the doorframe so that they could not get him in the car, so they picked up his legs to get him into the car, secured his seatbelt, and closed the door. While inside the car, Rojas continued to scream the same things.

During this encounter, according to Officers Pérez and Rivera and a bystander named José Candelaria, Rojas looked nervous, sweaty, pale, wild-eyed, had veins bulging at his temple, a purplish tint to his forehead, temples, and cheeks, and blackish lips. He did not appear injured except that, according to Candelaria, he had a small cut on his lips.

When Sergeant Miguel Rodríguez Crespi ("Rodríguez") arrived on the scene, Rojas was already in the squad car, still

screaming.  After Pérez and Rivera explained the situation to him, Rodríguez said they should take him to a medical facility.  Rivera suggested that they take him to the police station instead, since Rojas might injure people at the medical facility.  Rodríguez agreed, so Pérez and Rivera took Rojas to the police station in their patrol car.  Rojas continued to shout incoherently during the drive, which lasted a few minutes.  Rodríguez drove separately.

Upon arrival at the police station, Rodríguez observed Pérez and Rivera getting Rojas into the holding cell.  Rojas tried to put his legs against the doorframe again, and he also started kicking, although he did not land a kick on either officer.  Once they managed to get him in the cell, Pérez and Rivera decided to place him face down on the ground, still cuffed at the wrists behind his back.  They put tie wraps on his ankles so he could not open his legs.  While they were restraining him, Pérez did not observe any injuries or bruises on Rojas's body.  Desk officer Noelia Quiñones observed that, when he arrived at the police station, Rojas's face and lips were purple, but he did not appear to have suffered any blows.  While Rojas was in the cell, Quiñones did not hear a struggle between him or anyone else.

As Rojas continued to scream, Pérez and Rivera left him in the cell and closed the cell door.  Pérez instructed Quiñones

to call the paramedics, which she did at 9:38 p.m. After a few minutes, Rojas continued to speak incoherently, but at a lower volume. Pérez could see through the cell window that Rojas stayed on his stomach on the floor the entire time and that Rojas's forehead and temple became more and more purple. Eventually, Rojas stopped speaking altogether. Pérez instructed Quiñones to call again. When the paramedics arrived at 9:48 p.m., Pérez hurried out to meet them because he thought Rojas was dead or dying. At 9:50 p.m., the paramedics declared that Rojas had no vital signs.

Rojas's body was found with blood coming from his mouth; multiple lacerations, contusions, and abrasions throughout his body, including on his face, chin, shoulders, wrists, and legs; subarachnoid hemorrhage in his brain; and other injuries. The autopsy report lists the cause of death as bodily trauma and cocaine intoxication; the manner of death, "accident."

**B. Procedural History**

Plaintiffs filed the operative complaint, the second amended complaint, on April 9, 2012.[1] Plaintiffs alleged that

---

[1] The plaintiffs are Nancy I. Trinidad Torres, on behalf of her and Rojas's minor son C.Y.R.T., who appears on his own behalf and on behalf of Rojas's estate; and Rojas's mother Norma Miranda on her own behalf and on behalf of her minor son, Rojas's brother J.L.M.

Defendants, Officer Pérez, Sgt. Rodríguez, and then-PRPD Superintendent Pedro Toledo-Dávila ("Toledo"),[2] violated Rojas's Fourth and Fourteenth Amendment rights against unreasonable search and seizure, excessive use of force, and denial of urgent medical care. Plaintiffs also alleged a number of Puerto Rican law claims.

The district court granted summary judgment on Plaintiffs' various Fourth and Fourteenth Amendment claims. It held that any claims against Defendants in their official capacity for monetary damages were barred by the Eleventh Amendment. On the merits, it held that Defendants had probable cause to stop Rojas's car and that no reasonable jury could find that Defendants used excessive force in transporting and detaining Rojas at the police station.[3] Regarding denial of medical care, it held that there was insufficient evidence that Defendants were deliberately indifferent to a serious medical need. The court also held that there was insufficient evidence to support any supervisory liability claims against Sgt. Rodríguez or Superintendent Toledo and that Defendants were entitled to qualified immunity on the

---

[2] Default judgment was entered against Officer Rivera earlier in the litigation.

[3] Plaintiffs concede that there was no excessive force in the initial arrest, but contend that Defendants used excessive force in putting Rojas into the patrol car and restraining him in the holding cell.

excessive force and medical care claims.  After dismissing the federal claims, the district court declined to exercise supplemental jurisdiction over the remaining Puerto Rican law claims and dismissed them without prejudice.

On appeal, Plaintiffs challenge only the district court's decisions on the excessive force and denial of medical care claims and supervisory liability.

## II.  Standard of Review

A district court's grant of summary judgment is reviewed de novo.  United States ex rel. Jones v. Brigham & Women's Hosp., 678 F.3d 72, 83 (1st Cir. 2012).  Summary judgment is properly granted if the movant can demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A "genuine" dispute exists when a jury can reasonably interpret the evidence in the non-movant's favor.  A "material" fact is "one that might affect the outcome of the suit under the governing law." Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145, 150 (1st Cir. 2006) (quoting Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994)).

## III.   Discussion

### A. Excessive Force Claim Against Officer Pérez

The district court granted summary judgment in favor of Officer Pérez on Plaintiffs' excessive force claim on insufficient evidence and qualified immunity grounds.  We reverse and remand for trial because there appears sufficient evidence for Plaintiffs to survive summary judgment and because, regardless of whether the Fourth and Fourteenth Amendment standard applied, a reasonable officer would have known that it was unconstitutional to apply force in the way that the officers here appear to have done in transporting and incarcerating an arrestee, where the arrestee was already physically restrained and did not pose a great physical threat to the officers.

#### 1. Legal Standard for Excessive Force Claims Brought by Arrestees

As a preliminary matter, we note that the district court correctly applied an objective reasonableness standard to Plaintiffs' excessive force claim.  The Supreme Court has historically reserved the question of whether the Fourth Amendment standard of objective reasonableness or a Fourteenth Amendment substantive due process standard requiring a defendant to have a "sufficiently culpable state of mind," Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996), applies to persons who have been

arrested but who are not yet "pretrial detainees" because they have not yet gone before a magistrate judge for a probable cause hearing. Graham v. Connor, 490 U.S. 386, 395 n.10 (1989); Bell v. Wolfish, 441 U.S. 520, 536 (1979) (defining a pretrial detainee as someone who has had a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest" (alterations in original)).  At the time of the district court's decision, other circuits were split over this question.  Compare  Currie v. Chhabra, 728 F.3d 626, 629 (7th Cir. 2013), Aldini v. Johnson, 609 F.3d 858, 867 (6th Cir. 2010), Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000), United States v. Johnstone, 107 F.3d 200, 206 (3d Cir. 1997), Pierce v. Multnomah Cty., 76 F.3d 1032, 1042-43 (9th Cir. 1996), Austin v. Hamilton, 945 F.2d 1155, 1160 (10th Cir. 1991), abrogated on other grounds, Johnson v. Jones, 515 U.S. 304 (1995), and Powell v. Gardner, 891 F.2d 1039, 1043-44 (2d Cir. 1989), with Riley v. Dorton, 115 F.3d 1159, 1162-64, 1166 (4th Cir. 1997), abrogated on other grounds, Wilkins v. Gaddy, 559 U.S. 34 (2010), Cottrell, 85 F.3d at 1490, and Brothers v. Klevenhagen, 28 F.3d 452, 455-57 (5th Cir. 1994). The First Circuit has not yet answered the question, although some district courts within the First Circuit have applied the majority rule.  Moreau v. Gerardi, No. CIV.A. 08-40117-FDS, 2010 WL 4961676, at *11 (D. Mass. Nov. 24, 2010); see also Rivera-García

v. Román-Carrero, 938 F. Supp. 2d 189, 198-99 (D.P.R. 2013) (rejecting argument that the Fourteenth Amendment applied from the moment a suspect was "neutralized" by being handcuffed).

Since then, the Supreme Court has held that the appropriate standard for a pretrial detainee's Fourteenth Amendment excessive force claim is simply objective reasonableness. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473-74 (2015) (holding that a pre-trial detainee need not necessarily prove the officer's intent to harm or punish, only that, from an objective viewpoint, the officer's action was "not rationally related to a legitimate governmental objective or that it [was] excessive in relation to that purpose."). Since Kingsley has extended the objective reasonableness standard for use of force from the arrest stage through the probable cause hearing, whether the Fourth or Fourteenth Amendment standard applies presents less of a problem in cases like this one than before.

In this case, the district court "identif[ied] the specific constitutional right allegedly infringed by the challenged application of force," Graham, 490 U.S. at 394, as the Fourth Amendment's protection against unreasonable seizures. The parties do not challenge that holding, and we have no reason to do so as the alleged use of excessive force here occurred while Officers Pérez and Rivera were transporting Rojas to the police

-11-

station and then to a jail cell.  Given these facts, and given the authority favoring the application of the Fourth Amendment to similar factual scenarios, we apply the Fourth Amendment standard to Rojas's excessive force claim.  See Wilson, 209 F.3d at 715-16 (applying the Fourth Amendment to a claim based on force used against an arrestee just moments after he was first placed in a holding cell); Johnstone, 107 F.3d at 206-07 (applying the Fourth Amendment where an officer had allegedly assaulted an arrestee "in the police station garage, after he had been transported from the scene" of his initial encounter with the officer); Moreau, 2010 WL 4961676, at *11 (applying the Fourth Amendment where the alleged excessive force took place after the plaintiff "had just completed the booking process," "a few hours" after the plaintiff's arrest began).

## 2. Evidence of Excessive Force

Defendants admit that Pérez and Rivera used physical force to get Rojas into the patrol car and into the holding cell. Defendants claim that they only used the level of force necessary to get Rojas to comply, since Rojas resisted getting into the car and holding cell.  This version of events is supported by deposition testimony from Officer Pérez, who used force against Rojas, and deposition testimony from Sgt. Rodríguez and a

-12-

declaration from Officer Quiñones, who observed Pérez and Rivera putting Rojas in the holding cell.

Plaintiffs present no evidence to contradict Defendants' account of how Rojas was behaving on the way to the holding cell. Given the undisputed description of Rojas's behavior, Pérez was justified in using some level of force to compel Rojas to get into the patrol car and holding cell. It is reasonable to expect that Rojas would have some injuries. The question is whether the injuries he actually suffered can support a factual finding that Pérez used an unreasonable level of force on him.

Evidence of excessive force includes (1) photos of Rojas's body, (2) the autopsy report's descriptions of his internal injuries, (3) Dr. Shaker's expert opinion that Rojas's injuries are consistent with severe bodily trauma to the head and chest, and (4) the opinion of Lou Reiter, an expert witness on police practices, that Rojas's injuries resulted from "a use of force contrary to generally accepted police practices and excessive for the circumstances described by the arresting officers." Plaintiffs also emphasize that no one saw any injuries on Rojas's face at the arrest site (except a small cut to his lip) and yet, at the time of his death, Rojas had blood coming from his mouth, multiple abrasions, contusions, and lacerations throughout his

-13-

body, including his face, chin, shoulders, wrists, and legs, and subarachnoid hemorrhage in his brain.

Defendants respond with a declaration from the author of the autopsy report, Dr. Edda L. Rodríguez Morales, who opines that the injuries on the face were consistent with a fall, not a fist to the face, and that the subarachnoid hemorrhage in the brain is associated with cocaine use, not external trauma to the head. She clarified that even though she listed both bodily trauma and cocaine intoxication as causes of death on the autopsy report, she meant that the cause of death was "corporal trauma as a result of the cocaine intoxication."

This record shows a genuine dispute as to whether Officer Pérez used excessive force when transporting Rojas to the holding cell. In their summary judgment briefing and on appeal, the parties engaged in a battle of the experts regarding whether the cause of Rojas's death was cocaine-induced stroke or bodily trauma, but the specific causation is not necessary to determine whether there was a constitutional violation. Certainly, if a savage beating was the sole or primary cause of death, that would be strong evidence of excessive force. However, Pérez could still be liable for using excessive force even if Rojas had not died or if his death was caused only by cocaine intoxication. Cf. Wilkins, 559 U.S. at 37 (holding in the Eighth Amendment context that proof

-14-

of a significant injury is probative, but not required to succeed on a convicted prisoner's excessive force claim).

Here, a jury could look at the photos of Rojas's body, the autopsy report, eyewitness accounts of Rojas's lack of visible injuries before the police transported him, Reiter's opinion, and the autopsy report's listing of bodily trauma as a cause of death (even though Dr. Rodríguez has seemingly backed away from that conclusion and even though the autopsy report said the manner of death was "accident"), and reasonably conclude that the bodily trauma was the result of Pérez using excessive force against Rojas while transporting him to the holding cell.[4]  The evidence could also easily support the opposite conclusion -- that there was some other cause for the bodily trauma or that the level of force used was not excessive.  However, when the evidence supports a reasonable inference in the non-movant's favor, there exists a genuine issue of material fact that precludes summary judgment. The district court erred in holding otherwise.

---

[4] Dr. Shaker's opinion that Rojas was beaten after he was shackled at the wrists and ankles and that his death was caused by bodily trauma is helpful to Plaintiffs' case, but not necessary for Plaintiffs' claim to survive summary judgment.  Thus, we do not opine on the correctness of the district court's treatment of Dr. Shaker's report.

### 3. Qualified Immunity

Determining whether a defendant is entitled to qualified immunity involves two questions: (1) "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right," Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citations omitted); and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct," id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

Since there is sufficient evidence to make out an excessive force claim, Pérez is not entitled to qualified immunity on the first ground.

Nor is Officer Pérez entitled to qualified immunity on the "clearly established" ground. The district court stated in a footnote that Defendants may be entitled to qualified immunity because it was unclear in 2007 which constitutional standard governed arrestees' excessive force claims in the First Circuit. We are not persuaded. The main difference between the Fourth and Fourteenth Amendment excessive force standards prior to Kingsley was whether, in retrospect, we inquire into an officer's subjective mindset. However, at their core, both the Fourth and Fourteenth Amendments are concerned with whether an officer's actions depart from what a reasonable officer would do, and whether those actions

-16-

serve some legitimate governmental purpose.  See Kingsley, 135 S. Ct. at 2473-74; Graham, 490 U.S. at 397.

A reasonable officer faced with the question of what to do with Rojas would have known that using more force than necessary violated both of those standards and therefore a clearly established constitutional rule to use force in the way that the officers here appear to have done.  Here, during the entire time period in which the officers are alleged to have applied excessive force to Rojas (i.e., from Rojas's arrest to his death in the holding cell), Rojas was handcuffed and did not pose a great physical threat to the officers.  The record suggests that Rojas initially appeared paranoid, screaming incoherently, and that, while handcuffed, he attempted to resist being transported to the police station and being incarcerated.  There is sufficient evidence for a reasonable jury to conclude that the officers used force that resulted in disproportionately severe injuries to Rojas -- e.g., multiple lacerations, contusions, and abrasions throughout his body -- and ultimately in his death.  We therefore conclude that, regardless of whether the Fourth or Fourteenth Amendment applied after his arrest, a reasonable officer would have known that using force in the way that the officers here appear to have done in the particular factual circumstances that they encountered violated Rojas's constitutional rights.  See

Estate of Booker v. Gomez, 745 F.3d 405, 428-29 (10th Cir. 2014); Harris v. City of Circleville, 583 F.3d 356, 367 (6th Cir. 2009). Accordingly, Pérez is not entitled to qualified immunity on the excessive force claim.

### 4. Conclusion

In sum, the district court erred in granting summary judgment on the excessive force claim against Officer Pérez, and we reverse and remand.

### B. Excessive Force Claim Against Sgt. Rodríguez

Defendants argue that there is insufficient evidence to show that Sgt. Rodríguez used excessive force against Rojas. We agree that there is no evidence that Sgt. Rodríguez ever touched Rojas. However, we agree with Plaintiffs that Sgt. Rodríguez can nevertheless potentially be held liable for his failure to stop Pérez and Rivera from using excessive force.

"An officer may be held liable not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers." Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002). Here, Sgt. Rodríguez cannot be held liable for any force used against Rojas at the arrest site because he arrived too late to prevent it, as Rojas was already in the patrol car. Gaudreault v. Municipality of

Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990) (rejecting failure-to-intervene liability where the attack lasted only a few seconds and the other officers at the scene had no realistic opportunity to stop the officer-assailant).  However, he can potentially be liable for any excessive force he observed Pérez and Rivera using against Rojas after he arrived at the police station.  Since there is a genuine issue of material fact as to whether Pérez and Rivera used excessive force at the police station, there is also a genuine issue of material fact as to whether Rodríguez -- who admittedly watched Pérez and Rivera use force to get Rojas inside the prison cell -- failed to intervene.  Accordingly, we reverse and remand.[5]

### C. Denial of Medical Care Claims Against Pérez and Rodríguez

The district court granted summary judgment on Plaintiffs' denial of medical care claim because there was

---

[5] We acknowledge Defendants' argument that the complaint does not allege facts supporting a failure-to-intervene theory and that this Circuit has previously held that pleading excessive force does not give a defendant fair notice of a failure-to-intervene claim.  See Calvi v. Knox Cty., 470 F.3d 422, 431 (1st Cir. 2006). However, in this particular case, Defendants are not prejudiced by the discrepancy between the allegations in the complaint and what the evidence showed at the end of discovery, because the universe of facts surrounding Sgt. Rodríguez's failure to intervene is the same as the universe of facts surrounding Officer Pérez's use of force.  We are further persuaded by the fact that complaints can be amended as late as trial to conform to the evidence, Fed. R. Civ. P. 15(b)(1), and there would have been good cause to do so here.

insufficient evidence of Defendants' deliberate indifference to a serious medical need. The district court held that Defendants were entitled to qualified immunity on this claim for the same reason. We disagree and reverse and remand.

### 1. Legal Standard

Fourteenth Amendment substantive due process requires the government to provide medical care to persons who are injured while being apprehended by the police. City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). "The boundaries of this duty have not been plotted exactly; however, it is clear that they extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner." Gaudreault, 923 F.2d at 208. Government officials violate the Eighth Amendment if they display "deliberate indifference" to a prisoner's "serious medical needs." Id. A "serious medical need" "is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. Deliberate indifference requires (1) that "the official . . . be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) that he draw that inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). A factfinder can conclude that a government official was aware of a substantial risk of serious

harm based on the fact that the risk was obvious.  Id. at 842.
However, there is no deliberate indifference if an official
responds reasonably to the risk.  Id. at 844-45; see also Coscia
v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011) (deliberate
indifference can consist of "a conscious failure to provide medical
services where they would be reasonably appropriate").  Where it
is shown that an officer was deliberately indifferent to a serious
medical need of a pretrial detainee, no further mens rea of the
officer -- whether intent or motivation -- is necessary to state
a substantive due process claim.  See Cty. of Sacramento v. Lewis,
523 U.S. 833, 849 (1998) (observing that deliberate indifference
is "egregious enough" to satisfy the "conscience shocking" element
required of substantive due process claims, where the officer
exhibits deliberate indifference to the medical needs of a pretrial
detainee) (citing City of Revere, 463 U.S. at 244).

### 2. Evidence of Constitutional Violation

Here, there is some evidence that, while he was being
arrested, Rojas was sweaty, nervous, delusional, and yelling
incoherently.  The arresting officers observed that Rojas's face
was extremely pale and purplish around the forehead and temple
area, his eyes were bulging, and his lips were black.  Based on
these physical symptoms, a jury could reasonably find that Rojas
did not appear to be dangerously drunk or high.  On the other

hand, a rational jury could also conclude that Rojas's need for medical attention was so obvious that even a layperson would have easily recognized it.  The district court erred by relying solely on eyewitness Candelaria's observation that Rojas's only injury was a small cut on the lips in finding no genuine issue as to whether Rojas had a serious medical need.

With regard to the deliberate indifference prong, a rational jury could conclude based on Rojas's appearance and symptoms and Sgt. Rodríguez's suggestion that they take Rojas to a medical facility that a substantial risk of serious harm was obvious and that the Defendants were aware of and disregarded that risk.  It is true that Sgt. Rodríguez let Officer Rivera persuade him that they should take Rojas to the police station instead, which can be interpreted as a good-faith reassessment of the level of risk.  But, a jury could also reasonably infer that, in their concern for others' safety, the police took an unreasonable gamble with Rojas's welfare.  No matter how good the officers' intentions may have been, they may still be liable under the deliberate indifference standard if they recognized a serious risk to Rojas's health and chose to prioritize others' safety over seeking immediate medical attention for Rojas.  See Cty. of Sacramento, 523 U.S. at 849.  Because the evidence supports a reasonable

conclusion in Plaintiffs' favor, the district court erred in granting summary judgment.

### 3. Qualified Immunity

Because there is sufficient evidence to survive summary judgment, Defendants are not entitled to qualified immunity on the ground of insufficient evidence of a constitutional violation. Nor are they entitled to qualified immunity based on the "clearly established" prong either because the law on denial of medical care has long been clear in the First Circuit. See Gaudreault, 923 F.2d at 208; see also City of Revere, 436 U.S. at 244. Thus, Defendants are not entitled to qualified immunity on the denial of medical care claim.

### 4. Conclusion

In sum, the district court erred in granting summary judgment on the denial of medical care claims against Pérez and Rodríguez.

### D. Claims Against Superintendent Toledo

The district court granted summary judgment on any supervisory liability claims against Superintendent Toledo because, not only did Plaintiffs fail to adequately plead facts about Toledo's conduct, but they also failed to bring forth evidence supporting the barebones allegations that he acted with "reckless or callous" indifference to Rojas's rights.

-23-

We agree with the district court that Plaintiffs did not adequately plead facts going to Superintendent Toledo's liability. The only facts alleged in the complaint describe "Defendants" arresting and beating Rojas. It alleges no facts describing Toledo's conduct besides the conclusory allegation that he and other supervisors "ratified" their subordinates' actions with "reckless or callous indifference" to Rojas's rights. The complaint fails to allege any facts about PRPD's training, citizen complaint investigation, use of force tracking, or disciplinary practices.

Plaintiffs may not "raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment," Calvi v. Knox Cty., 470 F.3d 422, 431 (1st Cir. 2006). Allowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled. Martinez v. Petrenko, 792 F.3d 173, 179-80 (1st Cir. 2015). Thus, Plaintiffs' attempt to argue for the first time in opposition to Defendants' motion for summary judgment that Toledo failed to train and supervise his officers was properly rejected by the district court, and we affirm.

## IV. Conclusion

For the above reasons, we reverse and remand for trial Plaintiffs' claims against Pérez and Rodríguez, but affirm the district court's grant of summary judgment on Plaintiffs' claims against Toledo. In addition, we instruct the district court to reinstate the Puerto Rican law claims that it dismissed in its summary judgment order. See Fernández-Salicrup v. Figueroa-Sancha, 790 F.3d 312, 328 (1st Cir. 2015) ("If the dismissal of the linchpin federal claim proves to have been improvident . . . the state-law claims routinely are reinstated." (internal quotation marks and citations omitted)).

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.** Each party shall bear its own costs on appeal.