[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-11280

_____

MONTERIA NAJUDA ROBINSON,
as the natural parent of Jamarion Rashad Robinson,
and The of Estate of Jamarion Rashad Robinson,

Plaintiff-Appellant,

*versus*

WILLIAM SAULS,
Atlanta Police Officer,
STEVE SCHRECKENGOST,
Atlanta Police Detective,
STEVE O'HARE,
Atlanta Police Detective,
KRISTOPHER HUTCHENS,
Clayton County Police Officer,
JOSHUA MAUNEY,

2                    Opinion of the Court                    21-11280

Fayette County Sheriff's Officer, et al.,

                                        Defendants-Appellees,

DANIEL DOYLE,
Fulton County Detective, et al.,

                                        Defendants.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-00131-TCB

————————————————

Before JILL PRYOR, GRANT, and ANDERSON, Circuit Judges.

JILL PRYOR, Circuit Judge:

This case arises out of the shooting death of Jamarion Robinson. It requires us to decide whether video evidence creates a genuine dispute of material fact concerning whether law enforcement officers used excessive force while trying to arrest Mr. Robinson.

A group of Deputy United States Marshals and police officers from several counties in the Atlanta area—working together in

a joint law enforcement project called the Southeast Regional Fugitive Task Force ("Task Force")—attempted to execute two arrest warrants against Mr. Robinson at his girlfriend's townhouse apartment. To execute the warrants, the Task Force team knocked on the door of the apartment and asked several times for Mr. Robinson to come out. When Mr. Robinson failed to appear, the Task Force team breached the apartment's front door. Three members of the team, Inspector Eric Heinze, Officer Kristopher Hutchens, and Detective Danny Doyle, entered the apartment.[1] The three officers instructed Mr. Robinson to surrender. Mr. Robinson appeared on the apartment's second floor landing, pointing a gun at the officers. The three officers fired dozens of rounds at Mr. Robinson. They continued to shoot after he fell to the floor near the top of the stairs. To determine whether Mr. Robinson remained a threat, the Task Force team then detonated a flashbang grenade near him, and he did not react. The Task Force team ended the encounter by placing him in handcuffs and calling for medical support. Mr. Robinson died at the scene.

A bystander in a neighboring apartment building partially recorded the encounter. The video recording does not show what occurred inside the apartment during the shooting. It does,

---

[1] At the time of the shooting, Eric Heinze was a Deputy United States Marshal Inspector. Kristopher Hutchens was an officer with the Clayton County Police Department. Danny Doyle was a detective with the Fulton County Police Department. We refer to each of them as "Officer" for ease of reference.

however, include audio of a gunfire burst that took place after the flashbang exploded.

Mr. Robinson's mother, Monteria Robinson, filed claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against Officers Heinze, Hutchens, and Doyle, alleging that they violated her son's Fourth Amendment rights by using excessive force in attempting to arrest him. The three Task Force officers sought summary judgment on the *Bivens* claims. They argued that they were entitled to qualified immunity because they used a reasonable level of force under the circumstances. Ms. Robinson opposed the motion, arguing that there existed questions of fact material to whether the officers used excessive force at different points in time during their encounter with her son. Ms. Robinson relied on the bystander video, along with other evidence. The district court granted summary judgment to Officers Heinze, Hutchens, and Doyle based on qualified immunity.

Now, on appeal, Ms. Robinson renews her arguments that summary judgment should not have been granted because of genuine disputes of material fact relevant to whether the three officers used excessive force. After careful consideration, and with the benefit of oral argument, we affirm in part and reverse in part. We agree with the district court that summary judgment was appropriate on Ms. Robinson's claim against Officer Hutchens and on her claims against all three officers that are predicated on their actions before the flashbang detonated. But we agree with Ms. Robinson

that the bystander video created a genuine dispute of material fact as to whether Officers Doyle and Heinze used excessive force after the flashbang exploded. The district court therefore erred by granting summary judgment to Officers Doyle and Heinze on that issue.

## I.     BACKGROUND

In this section, we begin by describing why the Task Force team sought to arrest Mr. Robinson. We then turn to the shooting and the Georgia Bureau of Investigation's ("GBI") subsequent investigation. We conclude with a history of the proceedings that followed.

### A.     Events Leading to the Attempted Arrest of Mr. Robinson

A few weeks before the shooting, Ms. Robinson called the police when her son attempted to set her house on fire. Mr. Robinson left before the police arrived, but the Gwinnett County Police Department issued a warrant for his arrest. A short time later, two Atlanta Police Department officers encountered Mr. Robinson while responding to a call about a suspicious person. Mr. Robinson pointed a handgun at one of the officers and fled the scene. A second arrest warrant was issued against Mr. Robinson for aggravated assault against a police officer.

The local police referred the case to the Task Force. A Task Force officer spoke with Ms. Robinson, who told him that her son "had become increasingly unstable, violent, and unpredictable."

Doc. 248-5 at 3.[2] She also told him that Mr. Robinson might be suffering from unmedicated mental health issues. After some investigation, the Task Force officer determined that Mr. Robinson was living at his girlfriend's townhouse apartment.

A Task Force team that included Officers Heinze, Hutchens, Doyle, and several other officers assembled in a parking lot near the apartment complex to prepare to arrest Mr. Robinson. Officer Heinze carried a tactical shield and a Glock 22 handgun. Officer Hutchens had an MP5 rifle set to semi-automatic. The MP5 did "not have a burst fire setting." Doc. 248-4 at 3. Officer Doyle carried an H&K UMP .40—a submachine gun capable of shooting in bursts. The team discussed Mr. Robinson's attempted arson, his previous encounter with police, his potential mental health issues, and the possibility that he was carrying a gun. They planned to initiate a knock-and-announce at the apartment door to give Mr. Robinson an opportunity to surrender. If he did not respond, the team agreed, they would breach the apartment door.

## B.    The Attempted Arrest and Shooting

Most relevant to the issues on appeal, the record contains evidence of the Task Force team's account of the shooting. It also includes a video recording taken by a neighbor that shows the outside of the apartment while the shooting took place. We begin with

---

[2] "Doc." numbers refer to district court docket entries.

the Task Force team's description of the shooting and then turn to the video.

### 1.    The Task Force Team's Account

According to the testimony and affidavits of the officers involved, the Task Force team moved to the front door of the apartment with Officer Heinze at the front of the team. Officer Hutchens knocked on the door, stated that the police were outside, and asked Mr. Robinson to come out. He repeated this several times. Mr. Robinson did not come to the door. Another Task Force officer then announced that they would breach the door if Mr. Robinson refused to turn himself in. When Mr. Robinson did not respond, the Task Force team breached the door with a battering ram.

The apartment door opened into a living room area on the left and a staircase leading to the second floor on the right. Officer Heinze remained at the front of the team closest to the door while Officers Hutchens and Doyle were in the second and third positions behind him. The three Task Force officers again announced their presence and asked Mr. Robinson to come out. Officer Heinze heard noise coming from the second floor of the apartment and directed his attention toward the staircase. A wall obstructed Officer Heinze's view of the second-floor landing, but he could see feet near the top of the stairs. He instructed Mr. Robinson to come down the stairs slowly with his hands up. As Mr. Robinson began to walk down the stairs, Officer Heinze noticed that his "body was slightly bent" and that he had "something cupped in both of his hands." Doc. 248-3 at 7–8. As Officer Doyle shouted that Mr.

Robinson had a gun, Officer Heinze identified a semiautomatic handgun in Mr. Robinson's hands. According to Officer Heinze, Mr. Robinson pointed the gun at him. Officer Heinze then "discharged [his] firearm several times." *Id.* at 8. Officer Doyle also fired his weapon and saw some of his shots hit Mr. Robinson. Mr. Robinson ran back up the stairs. The officers stopped shooting and commanded Mr. Robinson to put the gun down and surrender.

For the next few minutes, Mr. Robinson periodically reappeared on the stairs, pointing his gun at the three officers. Officer Hutchens fired at Mr. Robinson the first time he reappeared. Officers Heinze and Doyle also fired at Mr. Robinson when he pointed his gun at them. They continued yelling to Mr. Robinson to put down his gun. The three officers and another member of the Task Force team heard two gunshot sounds come from Mr. Robinson's direction. They also heard what they identified as a slide moving on Mr. Robinson's gun, a sound consistent with reloading the gun.

Officer Doyle then saw Mr. Robinson "partially step[] out again." Doc. 230-2 at 36. He observed several gunshot wounds on Mr. Robinson's left hand and chest. Mr. Robinson pointed his gun at the officers, and Officer Doyle shot him in his left hip, causing him to fall down on the stairs. Mr. Robinson "fell to the floor near the top of the stairs with his upper torso on the landing and his posterior and his legs positioned down the stairs." Doc. 248-3 at 10. Officers Heinze, Hutchens, and Doyle moved forward to the base of the stairs to get a better view of Mr. Robinson. Mr. Robinson still held the gun in his right hand. The three officers instructed him to

drop the gun. Mr. Robinson "leaned up and moved the gun in a manner consistent with pointing it in the direction" of the officers. *Id.* at 11. They fired at Mr. Robinson. Officer Doyle later told the GBI that he fired at Mr. Robinson a second time when Mr. Robinson tried to raise his gun again.

After that series of gunshots, Officer Heinze ordered Mr. Robinson to show them his hands. Mr. Robinson did not respond, but Officer Heinze could see that he was still breathing. The officers were unsure whether Mr. Robinson still had a gun. To test whether Mr. Robinson remained a danger, Officer Hutchens threw a flashbang device behind Mr. Robinson. The device exploded, but Mr. Robinson did not react. After Mr. Robinson failed to respond, Officer Heinze stopped viewing him as a threat. Likewise, Officer Doyle "was confident that [Mr. Robinson] was unconscious." Doc. 277-7 at 16:41–:43.

According to Officers Heinze and Hutchens, no member of the Task Force team fired a weapon after the flashbang exploded. The Task Force team deployed a reconnaissance robot, which showed that Mr. Robinson no longer had a gun. Officer Hutchens placed Mr. Robinson in handcuffs and called for a tactical medic to administer first aid. The elapsed time between breaching the apartment door and placing Mr. Robinson in handcuffs was "approximately three to five minutes." Doc. 248-4 at 13. Mr. Robinson died at the scene.

### 2.    The Bystander Video

A bystander from a nearby apartment in another building recorded a video that began in the middle of the attempted arrest. Because the bystander was filming from next door, the video did not show Mr. Robinson or anything that took place inside his girl-friend's apartment. The recording showed the following outside the apartment.

Eight officers were bunched together outside the apartment's open front door. The officer closest to the door fired his gun into the apartment. Less than a minute later, an officer stated, "Put the gun down son and come out." Doc. 263-9 at :35. Two officers standing in the doorway of the apartment then fired their weapons while an officer holding a shield moved to the apartment door.

The bystander then moved inside his own apartment, which obstructed the camera lens's view of the shooting. Several rounds of gunfire were audible, however. Approximately two and a half minutes into the video, there was a loud popping noise. A Task Force team member later identified the noise as the flashbang exploding. About 20 seconds after the flashbang exploded, there was another burst of gunfire. At this sound, one of the officers standing outside of the apartment reacted by turning around to face the apartment door.

A Task Force team member who reviewed the video testified that the gunfire-burst sound was consistent with the noise produced by Officer Doyle's H&K UMP .40. He testified that Officer

Heinze's weapon also could have produced a noise like the sound in the video if Officer Heinze fired "in the right sequence" alongside someone else who was shooting. Doc. 238 at 16.

## C.    The Investigation After the Shooting

The GBI conducted an inquiry into the shooting. While searching the apartment, GBI agents found a bloody HiPoint .380 pistol at the top of the stairwell in the apartment. They also found three .380 shell cartridges and two spent .380 bullets. GBI agents observed defects in the stairwell wall that were consistent with someone shooting from the top of the steps. The investigators test-fired the recovered pistol and determined that it worked. The GBI then performed a forensic DNA test, which matched the blood on the pistol with Mr. Robinson's blood. The GBI concluded that the pistol fired the recovered .380 cartridges and one of the .380 bullets; the other bullet was too deformed to match it with the pistol. Based on his experience and review of the crime scene evidence, the GBI agent assigned to the investigation concluded that Mr. Robinson possessed a HiPoint .380 pistol and fired it at the Task Force officers.

The GBI estimated that the Task Force team fired about 100 bullets during their encounter with Mr. Robinson. An autopsy recovered 43 bullets and bullet fragments from Mr. Robinson's body and identified bullet wounds in his chest, pelvis, legs, and hands.

The medical examiner did not dissect the wound tracks to match the entry wounds on Mr. Robinson's body with his exit wounds.[3]

A GBI agent found gunpowder residue on Mr. Robinson's shirt. But the test that identified the gunpowder residue could not determine whether it came from the HiPoint .380 pistol or another weapon. The test also did not reveal the distance from which Mr. Robinson was shot; thus, it was inconclusive as to Ms. Robinson's contention that he was shot from "within two or three feet." Doc. 227 at 33.

---

[3] During oral argument, Ms. Robinson's counsel referred to photographs which, he represented, show two bullets being removed from the apartment's second-floor landing. Ms. Robinson failed to cite or rely on these photographs in her summary judgment filings in the district court. Because Ms. Robinson never brought the photographs to the district court's attention, the court did not err by not considering them. See Chavez v. Sec'y Fla. Dep't of Corrs., 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record[.]"). In addition, Ms. Robinson submitted no witness testimony or other evidence that would authenticate the photographs in accordance with Federal Rule of Evidence 901. See United States v. Clayton, 643 F.2d 1071, 1074 (5th Cir. Unit B Apr. 1981) ("[I]t is sufficient if [a witness qualifying a photograph] recognizes and identifies the object depicted and testifies that the photograph fairly and correctly represents it."); see also Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981). For these reasons, the district court did not err by failing to consider the photographs, and we will not consider them on appeal.

### D.    Procedural History

After the shooting, Ms. Robinson filed suit. She amended her complaint multiple times and ultimately asserted, among other things, *Bivens* claims against Officers Heinze, Hutchens, and Doyle.[4] She alleged that the three Task Force officers used excessive force in violation of her son's Fourth Amendment rights. The officers moved for summary judgment on Ms. Robinson's *Bivens*

---

[4] Ms. Robinson also asserted excessive-force claims against other members of the Task Force team: William Sauls, Steve Schreckengost, Steve O'Hare, Joshua Mauney, and "Agent Tez," who was later identified as Santez Kindred. In addition, she asserted a conspiracy claim and state-law tort claims against these officers and against Officers Heinze, Hutchens, and Doyle. For Ms. Robinson's state-law claims, the district court substituted the United States in place of the officers in accordance with 28 U.S.C. § 2679(c). The district court then granted summary judgment to the defendants on all claims. On appeal, Ms. Robinson no longer contends that Mr. Sauls, Mr. Schreckengost, Mr. O'Hare, Mr. Mauney, or Mr. Kindred used excessive force. In addition, Ms. Robinson's initial appellate brief makes no mention of her state-law tort-law claims and makes only a passing reference to her conspiracy claim. "Any issue that an appellant wants the Court to address should be specifically and clearly identified in the brief." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004). Because Ms. Robinson failed to adequately present these claims on appeal, she has waived them. Accordingly, we affirm the summary judgment in favor of Mr. Sauls, Mr. Schreckengost, Mr. O'Hare, Mr. Mauney, and Mr. Kindred on Ms. Robinson's excessive force claims against them. And we affirm the summary judgment to all defendants on Ms. Robinson's conspiracy and state-law tort claims for the same reason.

claims.[5] They argued that qualified immunity protected them be-
cause their use of force was objectively reasonable.

Ms. Robinson opposed the motion, contending that multi-
ple issues of fact existed concerning the officers' use of force. She
argued that there was a question of fact concerning whether her
son pointed a gun at the Task Force team. Next, she argued that
the officers used excessive force when they continued to fire at Mr.
Robinson after he fell. She contended that her son could no longer
hold a gun once he fell. To support this argument, Ms. Robinson
relied on expert testimony from Dr. Neal Small, an orthopedic sur-
geon. Dr. Small testified that Mr. Robinson lost his ability to stand
and to fire a gun due to the gunshot wounds he received. He
opined that the damage to Mr. Robinson's right hand was ex-
tremely unlikely to have occurred while Mr. Robinson was in a su-
pine or prone position. But he acknowledged that he did not know
"when Mr. Robinson would have been incapable or capable of fir-
ing a weapon or raising and pointing a weapon" and that he could
"not offer[] any opinions about when during this incident precisely
Mr. Robinson became incapable of doing so." Doc. 234 at 34. Ms.
Robinson concluded by arguing that the video evidence

---

[5] Officer Doyle died while this action was pending. The district court substi-
tuted for Officer Doyle the administrator of his estate, Pamela Doyle. The dis-
trict court allowed Pamela Doyle to adopt Officers Heinze and Hutchens' mo-
tion for summary judgment.

contradicted the officers' statements that they did not fire at Mr. Robinson after the flashbang revealed that he was unresponsive.

The district court issued an order granting summary judgment to Officers Heinze, Hutchens, and Doyle. The court concluded that the three officers' use of force was reasonable and thus did not violate Mr. Robinson's constitutional rights. It rejected Ms. Robinson's argument that there existed a genuine dispute of fact about whether her son had a gun. Next, it determined that the record evidence failed to create a genuine dispute of fact about whether the officers shot an unarmed Mr. Robinson after he initially fell. In addition, the district court disregarded the bystander video, noting that it was "not sufficiently probative to create a genuine issue for trial as to whether Defendants used deadly force after Robinson became unresponsive." Doc. 303 at 39.

Ms. Robinson timely appealed.

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must draw all reasonable inferences in favor of the non-moving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

"'When opposing parties tell two different stories, one of which is blatantly contradicted by the record [as with a video recording of the incident], so that no reasonable jury could believe it, a court should not adopt that version of the facts.'" *Manners v. Cannella*, 891 F.3d 959, 967 (11th Cir. 2018) (alteration adopted) (quoting *Scott v. Harrison*, 550 U.S. 372, 380 (2007)).

## III.    DISCUSSION

Ms. Robinson contends that the district court erred in concluding that Officers Heinze, Hutchens, and Doyle were entitled to qualified immunity. After careful review, we disagree as to Officer Hutchens. The district court correctly ruled that Officer Hutchens was entitled to qualified immunity. We agree with Ms. Robinson, however, that the district court erred by granting summary judgment to Officers Doyle and Heinze based on qualified immunity.

To receive qualified immunity, an official "must establish that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021) (internal quotation marks omitted). There is no dispute that the three Task Force officers acted within their discretionary authority, so the burden shifts to Ms. Robinson to "show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). We begin by examining whether the officers violated Mr. Robinson's Fourth Amendment rights. We

then consider whether those rights were clearly established at that time.

## A.    A Jury Could Reasonably Conclude that Officers Doyle and/or Heinze Violated Mr. Robinson's Fourth Amendment Rights by Using Excessive Force After the Flashbang Revealed that Mr. Robinson Was Unresponsive.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excess force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). "Reasonableness is the touchstone for all excessive force claims, regardless of whether the force used was deadly." *Hammett v. Paulding Cnty.*, 875 F.3d 1036, 1048 (11th Cir. 2017). In assessing reasonableness, "we judge the officer's use of force on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1272 (11th Cir. 2021) (internal quotation marks omitted). "As to deadly force, a police officer may use such force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015).

Ms. Robinson largely concedes that the three Task Force officers acted reasonably in firing the first shots: the evidence showed

that her son pointed a gun at them.[6] Instead she asserts that the three officers used excessive force by continuing to shoot. She argues that the evidence, viewed in her favor, shows that the officers continued shooting at Mr. Robinson after he fell and could no longer hold a gun. In addition, she contends that the video evidence shows the officers used excessive force after the flashbang exploded. We examine these arguments in turn.

### 1.     The Shooting After Mr. Robinson Fell

Ms. Robinson relies primarily on Dr. Small's testimony to support her argument that the three Task Force officers fired at her son after he fell and could no longer hold a gun. Dr. Small testified that at some point Mr. Robinson became physically incapable of

---

[6] Ms. Robinson's 30-page brief contains two sentences disputing the district court's finding that her son possessed an operable HiPoint .380 pistol. We consider this issue abandoned. "A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012). But even if we were to consider Ms. Robinson's argument, it would fail. Ms. Robinson points out that a GBI agent described the pistol as rusty and in poor condition. True, but the GBI agent was able to fire the gun, demonstrating that it was operable. Ms. Robinson also calls attention to the lack of fingerprints on the pistol. But a GBI agent assigned to investigate the shooting testified that it was "not uncommon" to find no fingerprints on a gun. Doc. 231 at 38. One of our sister circuits has noted that "successful development of latent prints on firearms is difficult to achieve" and that "[i]n reality, very few identifiable latent prints are found on firearms." *United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005) (internal quotation marks omitted). Under the facts of this case, the lack of fingerprints does not create a triable issue as to whether Mr. Robinson had a gun.

21-11280                Opinion of the Court                19

standing or shooting a gun. Ms. Robinson argues that the district court incorrectly discounted this evidence by making "improper credibility determinations" concerning Dr. Small. Appellant Br. at 19. We disagree.

The problem with Dr. Small's testimony is that he acknowledged he did not know "when Mr. Robinson would have been incapable or capable of firing a weapon or raising and pointing a weapon." Doc. 234 at 34. Dr. Small further testified that Mr. Robinson most likely did not receive the bullet damage to his hands while he was in a supine or prone position. According to Ms. Robinson, this evidence shows that her son's hands must have been injured before he fell. But Dr. Small also opined that if Mr. Robinson was "in a seated position[,]" then he was "[m]uch more likely" to have received gunshot damage to his hands. *Id.* The sitting posture Dr. Small described is consistent with Officer Heinze's account that after Mr. Robinson fell, he "leaned up and moved the gun in a manner consistent with pointing it in the direction of" Officer Heinze and his team. Doc. 248-3 at 11.

Ms. Robinson next points to Officer Doyle's statement to the GBI during its investigation of the incident. Officer Doyle told the GBI that Mr. Robinson had "several gunshot wounds" on his "left hand and chest" while he was still standing. Doc. 230-2 at 36. This evidence does not create a genuine dispute of fact about Mr. Robinson's ability to hold a gun, though, because Officer Doyle also stated that Mr. Robinson held the gun in his right hand after he fell.

In summary, the evidence viewed in Ms. Robinson's favor shows that the officers' gunfire injured Mr. Robinson's left hand before he fell. At some point during the shooting, he lost the ability to stand or hold a gun in either hand. And according to Ms. Robinson's own expert, it was very unlikely that Mr. Robinson sustained these injuries while in a supine or prone position. None of this evidence conflicts with the officers' account that Mr. Robinson fell but then "leaned up" and pointed his gun at them with his right hand. "It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself." *Hunter v. City of Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019). We thus conclude that the district court correctly granted summary judgment to Officers Heinze, Hutchens, and Doyle to the extent Ms. Robinson's *Bivens* claims were based on their shooting Mr. Robinson after he fell.

### 2.    The Shooting After the Flashbang

Ms. Robinson also claims that the three Task Force officers used excessive force after the flashbang exploded. The district court granted summary judgment on this portion of Ms. Robinson's claim after determining that the bystander video did not "create a genuine issue for trial as to whether Defendants used deadly force after Robinson became unresponsive." Doc. 303 at 39. After reviewing the video, we agree with the district court that summary judgment was appropriate for Officer Hutchens because no evidence showed that he fired after the flashbang exploded. We conclude, however, that there is a genuine dispute of material fact as

to whether Officers Doyle and Heinze used excessive force by shooting Mr. Robinson after he became unresponsive.

At the outset, it is undisputed that Mr. Robinson did not react to the flashbang's explosion. At this point, the officers believed that Mr. Robinson was unconscious, and they no longer considered him a threat. Nonetheless, a burst of gunfire was audible on the bystander video approximately 20 seconds after the flashbang exploded. The gunfire sound on the video was consistent with the burst noise made by Officer Doyle's H&K UMP .40. There was also testimony that Officer Heinze's gun could have produced the sound on the video if he fired it "in the right sequence" with another shooter. Doc. 238 at 16. By contrast, Officer Hutchens' MP5 was incapable of producing the sound on the video because it lacked "a burst fire setting." Doc. 248-4 at 3. The district court properly granted summary judgment to Officer Hutchens on this claim, but the court failed to account for the audio evidence in the bystander video in granting summary judgment to Officers Heinze and Doyle.

Officer Heinze testified that he and Officer Doyle shot at Mr. Robinson only while he brandished a gun at them. Therefore, they argue, Mr. Robinson could not have received his wounds after the flashbang revealed he was incapacitated. Officer Heinze's testimony is contradicted by the burst fire noise on the bystander video, however. *See Manners*, 891 F.3d at 967. Based on the video, a reasonable jury could find that Officer Heinze misrepresented what occurred in the apartment after the flashbang exploded and that

Mr. Robinson received some of his bullet wounds from the burst fire after the flashbang. Cf. *Montano v. City of Chicago*, 535 F.3d 558, 567 (7th Cir. 2008) ("Where a witness's testimony is a compound of truth and falsity, the prudent course is to permit the jury to sort through it." (internal quotation marks omitted)).

The officers also argue that the video failed to show: "where the alleged shots were fired, or by whom." Appellee Br. at 44. It is true that the video did not show where the shots originated, but it showed an officer standing outside of the apartment reacting to the burst-fire noise by turning back to face the door. So the shots could have been fired only by the officers who were inside the apartment.

The evidence, viewed in the light most favorable to Ms. Robinson, created a genuine issue of material fact concerning whether Officer Doyle individually or Officers Doyle and Heinze together shot Mr. Robinson after the flashbang exploded.

We next turn to whether the shooting that occurred after the flashbang exploded violated Mr. Robinson's Fourth Amendment rights. In *Tennessee v. Garner*, the Supreme Court laid out three factors to guide courts' Fourth Amendment reasonableness analysis in cases involving deadly force. *Tennessee v. Garner*, 471 US. 1, 11–12 (1985). Under *Garner*, we consider whether the officer who used deadly force: (1) had "probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others," or that the suspect had "committed a crime involving the infliction or threatened infliction of serious physical harm[;]" (2) reasonably believed that the use of deadly force was

"necessary to prevent escape[;]" and (3) had given some warning about the possible use of deadly force, if feasible. *Id.*

Applying the *Garner* factors to the evidence viewed in the light most favorable to Ms. Robinson, we conclude that she met her summary-judgment burden to show that her son suffered a Fourth Amendment violation. Although the use of deadly force against Mr. Robinson initially was justified, "the level of force that is reasonable may change during the course of a police encounter." *Hunter*, 941 F.3d at 1280. On balance, the *Garner* factors support the conclusion that Officer Doyle by himself or together with Officer Heinze used excessive force after the flashbang exploded.

The first factor—threat of serious physical harm—strongly supports that a Fourth Amendment violation occurred. It is undisputed that after the flashbang detonated, Mr. Robinson no longer resisted arrest or otherwise threatened Officers Doyle or Heinze. Indeed, the evidence indicated that Mr. Robinson was unconscious, so neither officer had any cause to believe that he posed a threat of serious physical harm. Thus, at this point, the use of deadly force was disproportionate to the threat that Officers Doyle and Heinze faced.

The remaining *Garner* factors do not help the officers. The second factor, which looks at whether an officer needed to use deadly force to prevent escape, cuts unambiguously against Officers Doyle and Heinze. No reasonable officers would believe they needed to use deadly force to prevent the unconscious Mr. Robinson from escaping. And the third factor is largely irrelevant: neither

Officer Doyle nor Officer Heinze warned Mr. Robinson that they would shoot him after the flashbang exploded, but he would not have heard a warning in any event. For these reasons, we conclude that a reasonable jury could find that Officer Doyle by himself or together with Officer Heinze used excessive force by shooting Mr. Robinson after the flashbang showed that he was unconscious.[7]

---

[7] Ms. Robinson alleged in her Third Amended Complaint that the defendants stood directly above her son and fired two bullets into him after the flashbang detonated. No reasonable jury could make such an inference based on the evidence in the record. Ms. Robinson points to the gunshot residue on her son's shirt as evidence that he was shot at close range. But the GBI agent who tested the shirt's gunshot residue conceded that his analysis could not determine where the shooter was located when the shots were fired. She next contends that one gunshot wound in Mr. Robinson's leg must have come from someone shooting from above. This argument is undercut by one of her own experts, who explained that determining bullet trajectory from entrance and exit wounds was "all speculation" because the medical examiner did not dissect the bullet tracks. Doc. 232 at 16. "Speculation does not create a genuine issue of fact, instead; it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (internal quotation marks omitted).

Ms. Robinson pled that the defendants stood directly above her son and fired down at him after the flashbang detonated, but the evidence—viewed in the best light for her—shows only that Officer Doyle by himself or together with Officer Heinze shot Mr. Robinson from somewhere in the apartment after the explosion. This discrepancy between the operative complaint and the evidence does not prejudice either Officer Doyle or Officer Heinze, however. Regardless of the location from which Mr. Robinson was shot, the complaint included allegations that he was shot after the flashbang exploded, so Officers Doyle and Heinze had notice of these accusations. *See Miranda-*

B.      **Clearly Established Law Demonstrated that Shooting an Unresponsive Mr. Robinson Was Unconstitutional.**

Having concluded a jury could find that Officers Doyle and Heinze used excessive force after the flashbang explosion, we move to whether the two officers violated Mr. Robinson's clearly established rights. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). "The ordinary way of showing that a right is clearly established is by showing that a materially similar case has already been decided." *Bradley v. Benton*, 10 F.4th 1232, 1242 (11th Cir. 2021). "The rule requiring particularized case law to establish clearly the law in excessive force cases has a narrow exception known as the obvious clarity rule." *Glasscox v. City of Argo*, 903 F.3d 1207, 1218 (11th Cir. 2018) (alteration adopted) (citation omitted) (internal quotation marks omitted). "To come within the narrow exception, a plaintiff must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on

_____

*Rivera v. Toledo-Davila*, 813 F.3d 64, 73 n.5 (1st Cir. 2016) (defendant not prejudiced by discrepancy between allegations and the evidence because they were within the same "universe of facts"). And "complaints can be amended as late as trial to conform to the evidence, Fed. R. Civ. P. 15(b)(1), and there would have been good cause to do so here." *Id.*

point." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (alteration adopted) (internal quotation marks omitted).

Based on these principles, we conclude that shooting an unconscious suspect was clearly unlawful in August 2016, when the shooting in this case occurred. It would have been clear to any reasonable officer that such conduct would constitute excessive force in violation of the Fourth Amendment. Our decision in *Hunter v. City of Leeds* is instructive.

*Hunter* required us to decide whether the district court erred in denying qualified immunity to a police officer who shot a suspect after the suspect dropped his gun and was no longer evading arrest. *Hunter*, 941 F.3d at 1272. In *Hunter*, the police officer responded to a 911 call about a shooting. *Id.* at 1271. A car chase ensued as the officer pursued the suspect to his home. *Id.* at 1271–72. Once the suspect parked his car, the officer told him to raise his hands. *Id.* at 1272. Instead, the suspect aimed a gun at the officer. *Id.* The officer fired three shots at the suspect. *Id.* The suspect recoiled into his car and dropped his gun through the open car door. *Id.* The officer then fired off a second round of gunfire consisting of seven shots. *Id.*

The suspect filed an excessive-force claim against the officer. *Id.* at 1273. The officer sought qualified immunity, which the district court denied. *Id.* On appeal, we affirmed the district court's denial of qualified immunity as to the officer's second round of shots. *Id.* at 1280. After concluding that the additional seven shots amounted to excessive force, we turned to whether the officer

violated a right that was clearly established in 2013, when the shooting happened. *Id.* at 1280–81. We held that the officer had fair warning that his actions were unlawful because "[t]he use of deadly force against a suspect who, though initially dangerous, has been disarmed or otherwise become non-dangerous, is conduct that lies 'so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct is readily apparent.'" *Id.* at 1281 (alteration adopted) (quoting *Lee*, 284 F.3d at 1199).

Given our holding in *Hunter*, we conclude that it was clearly established in 2016 that shooting an incapacitated suspect constituted excessive force in violation of the Fourth Amendment. Although we decided *Hunter* in 2019, we concluded in that case that by at least 2013 it was readily apparent that using deadly force on a suspect who had been but was no longer a threat was unconstitutionally excessive. If, in *Hunter*, the officer's second round of gunfire was conduct that lay "so obviously at the very core of what the Fourth Amendment prohibits," *id.*, we see no reason why shooting an unconscious Mr. Robinson would not also be an obvious use of excessive force. Therefore, we conclude that Officers Doyle and Heinze are not entitled to qualified immunity on the shots that were fired after the flashbang exploded.

## IV.    CONCLUSION

The district court correctly granted summary judgment to Officer Hutchens because he was entitled to qualified immunity. The district court also correctly determined that Officers Doyle and Heinze were entitled to qualified immunity for their actions before

the flashbang detonated. Accordingly, we affirm those portions of the district court's order. The district court erred, however, by granting qualified immunity to Officers Doyle and Heinze for their actions after the flashbang exploded. We therefore reverse the district court's order insofar as it granted them summary judgment on Ms. Robinson's claim that they employed excessive force after the flashbang detonated. We remand for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.