[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13326

_____

SHERIKA FRANKLIN,
as Personal Representative of the Estate
of Christopher Redding, Jr., the Deceased,

                                        Plaintiff-Appellant,

*versus*

JASON POPOVICH,
Deputy; in his individual capacity,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

2                    Opinion of the Court                    22-13326

D.C. Docket No. 6:21-cv-00383-PGB-DCI

_____

Before JILL PRYOR, BRANCH, and ED CARNES, Circuit Judges.

BRANCH, Circuit Judge:

On February 28, 2017, police went to execute an arrest warrant for parole violations related to robbery charges on Christopher Redding. The warrant specifically stated that Redding was a "Violent Felony Offender of Special Concern." The officers spotted Redding exiting an apartment complex and instructed him to put his hands up and surrender. Instead, he started shooting, and a brief gunfight ensued, wounding one of the officers. Redding fled, dropping the gun somewhere in the process, and was eventually shot several times and fell prone on the ground. Two officers, including Deputy Jason Popovich, caught up to him and subdued him. Redding was so bloody from his gunshot wounds that the deputies had to wait for personal protective equipment before putting hands on him to cuff him. They stood on his arms and told him "Stop moving"; "Remain still"; "Help is on the way"; and "Keep your hands away from you." After about two minutes, as other officers went to bring protective gloves and care for the wounded officer, Redding abruptly yelled "I'm dying" and made a sudden movement—pulling one of his hands inward toward his body. Popovich shot Redding twice in the back of the head, killing him.

Sherika Franklin filed this 42 U.S.C. § 1983 lawsuit as Redding's personal representative, alleging excessive force under the Fourth Amendment's unreasonable seizures clause. The district court granted summary judgment in favor of Popovich on qualified immunity grounds, holding that, because a reasonable officer could believe that Redding's sudden movement was an attempt to fight back, his case was materially distinguishable from the cases Franklin relied on to show clearly established law.

After review, and with the benefit of oral argument, we affirm.

## I.    Background

### A. Factual Background

Redding was wanted by police in connection with a series of strong-arm robberies. Popovich was a member of a specialized unit trained to surveil and apprehend violent suspects, the Investigative Support Squad ("ISS") Unit. Popovich's unit originally arrested Redding in late January 2017, and transported him to Florida's Orange County Jail. Redding was mistakenly released on bond (for which he was not eligible) a few days later. A new warrant was issued for his arrest. The warrant was marked "Violent Felony Offender of Special Concern."

On February 28, 2017, the ISS Unit received information that Redding was at a certain apartment complex. Popovich's unit was dispatched to the apartments to locate and apprehend Redding. In addition to Popovich, the Unit included Sergeant Rick Stelter, Deputy Chris Marcus, Deputy John Leone, and Deputy Javier

Alvaro.  The Unit received word over the radio that Redding was armed and had resolved that he would not go back to jail.

When the Unit arrived at the apartment complex, they split up, and set up surveillance of a car belonging to an associate of Redding.  While they were watching, Redding (along with a woman and two young children) emerged from the apartment complex and walked toward the car.

Sergeant Stelter gave the command to "takedown" Redding, at which point the officers activated their emergency lights and emerged from their vehicles—armed and commanding Redding to show his hands.  Redding did not comply, though he did raise his left hand.  Stelter yelled "[s]how me your right hand" and Redding did not comply.

Seconds later, a bullet struck Sergeant Stelter in the shoulder.[1]  The officers returned fire and Redding fled.  While Deputy Marcus stayed behind to aid Sergeant Stelter, Deputies

---

[1] Franklin points to projectile analysis from a report by the Florida Department of Law Enforcement about the incident (the "FDLE Report") in an attempt to suggest that friendly fire, and not Redding, shot Stelter.  This projectile analysis, she says, "does not include any evidence that the projectile that struck Deputy Stelter came from Mr. Redding's gun."  But Franklin's inference that Stelter was struck by friendly fire does not follow from the evidence.  As the district court said, "nothing in the record indicates that Sergeant Stelter was struck by friendly fire."  To the contrary, Deputy Leone testified he saw the muzzle flash come from inside Redding's vehicle.  Regardless—the fact that there is not affirmative evidence that the bullet that struck Stelter came from Redding does not mean that it did not, and it certainly does not mean that no reasonable officer in the moment could not have believed it did.

22-13326                 Opinion of the Court                           5

Alvaro, Leone, and Popovich pursued Redding through two parking lots, running in and out of cars for cover. The deputies believed that Redding was either actively shooting at them or capable of doing so.

At some point, Redding dropped his weapon but continued to flee.[2] Popovich testified that he did not see Redding drop the weapon and did not realize he no longer had it.[3] Popovich also testified that, at one point, Redding popped up "with his hands together"—as though he was aiming a gun—at which point Popovich took cover and heard shots being fired.

When Popovich next looked up from behind cover, Redding was on the ground. Popovich testified that he believed Redding had the gun underneath him because he did not see it lying anywhere near the area where Redding had fallen. Popovich and Leone approached Redding where he lay, bloody from several gunshot wounds. They did not immediately handcuff him because

[2] The gun was later recovered in the parking lot between where the shooting began and where Redding stopped running.

[3] Franklin argues that Popovich must have known Redding was unarmed, suggesting that "at least Deputy Leone" saw Redding drop his firearm, and thus Popovich also "knew, or should have known[, that] Mr. Redding was unarmed" because "Popovich should have [seen that fact] as well." But even if Leone knew that Redding had dropped his gun, Franklin does not point to any evidence that Leone told Popovich—and there is no evidence that Popovich had exactly the same attention and vantage point as Leone. Thus, the district court correctly rejected these inferences as "unsupported."

he was bleeding, and they did not have personal protective equipment to protect them from any blood borne diseases.

Popovich and Leone told Redding "Stop moving"; "Remain still"; "Help is on the way"; and "Keep your hands away from you." When backup arrived, they asked the additional officers to get them gloves in order to secure Redding. In the meantime, Leone and Popovich stood on Redding's arms to prevent him from moving while they waited for the gloves, guns drawn and pointed at Redding.

A few moments later, Redding yelled "I'm dying" and made a sudden movement, pulling one of his hands inward toward his body. Popovich fired two shots at Redding's head, killing him. Popovich testified he believed Redding was reaching for his gun.

### B. Procedural History

Franklin filed this lawsuit as the personal representative of Redding's estate. She brought a single claim against Popovich, alleging that his use of deadly force violated Redding's clearly established Fourth Amendment rights (via the Fourteenth Amendment) under 42 U.S.C. § 1983. Popovich moved for summary judgment, arguing that he was entitled to qualified immunity. The district court granted the motion.

The district court concluded that Franklin had shown a genuine issue of fact about whether Popovich's use of force was objectively reasonable under the Fourth Amendment. On the one hand, the court explained, the crimes leading up to Popovich's use of force were "extremely severe"; Redding "was a wanted violent

felon"; Popovich "had probable cause to believe . . . that [Redding] posed a threat of serious physical harm to those at the scene"; Redding "was at least actively resisting . . . directives to not move his arms" even if "the extent of [Redding's] movements" was in dispute; and Popovich had given Redding sufficient notice about the use of deadly force by commanding him to "stop moving, remain still . . . and keep your hands away from you." But on the other hand, the district court believed that a jury could find Popovich knew Redding "no longer possessed his gun at the time when he was shot."

While "nothing in the record show[ed] that [Popovich] was aware that [Redding] was no longer armed," the district court concluded that "the mere fact that [Redding] was unarmed create[d] a credibility issue," which the court had to resolve in Franklin's favor at summary judgment. Further, the district court said, "it is an undisputed fact that [Redding's] back was facing [Popovich] when [he] fired . . . which [was] circumstantial evidence that [spoke] to the reasonableness of [Popovich's] perception of a threat and his response to it." The district court also found it relevant that Redding "had already been shot at least eight times and was obviously bleeding to the point that the officers required personal protective equipment to safeguard against blood-borne diseases in order to fully apprehend [Redding]." Thus, the district court concluded, because the question of "whether [Popovich] reasonably believed the use of deadly force was necessary to prevent [Redding] from inflicting further serious physical harm hinge[d] on whether it was reasonable for [Popovich] to believe

[that Redding was] armed and/or to interpret his movements as threatening," the dispute about what Redding knew produced a dispute about whether his use of force was reasonable.

Finally, having concluded that the reasonableness of Popovich's use of force was a jury question, the district court found Popovich was nonetheless entitled to qualified immunity because Franklin had not shown the shooting violated clearly established law. The court explained that Franklin would need to show that, at the time of the shooting, it was clearly established that "it was objectively unreasonable for [Popovich] to shoot [Redding] because of his mistaken belief that" Redding, who was "partially non-compliant," "was about to fight back using a deadly weapon." And "[t]he only case that [Franklin] affirmatively proffer[ed]" to that end was *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016), which was factually distinguishable. While Franklin *asserted*, in a conclusory manner, that Redding was lying prostrate and compliant on the ground like the victim in *Perez*, the court pointed out that Franklin had no evidence to rebut the officers' claims that "the previously armed [Redding,] who had the moment before engaged in a shootout with the officers[,] was at least partially non-compliant and moving in a way the officers believed to indicate an attempt to fight back."

Thus, the court concluded, Franklin had not shown that Popovich violated clearly established law, and Popovich was entitled to qualified immunity.

Franklin appealed.

## II.      Standard of Review

"We review *de novo* a grant of summary judgment based on qualified immunity, construing the facts and drawing all inferences in the light most favorable to the nonmoving party." *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir.), *cert. denied*, 143 S. Ct. 110 (2022). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Wade v. United States*, 13 F.4th 1217, 1223 (11th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). Finally, "[w]e may affirm for any reason supported by the record, even if not relied upon by the district court." *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 n.12 (11th Cir. 2018) (quotation omitted).

## III.      Discussion

Franklin argues that the district court erred in granting summary judgment to Popovich based on qualified immunity. In particular, she contends that the district court was wrong to conclude that Popovich had not violated clearly established law in (purportedly) violating Redding's right to be free from unreasonable seizure (here, excessive force).[4] On a careful review,

---

[4] Franklin also raises two other, peripheral arguments.

The first is that the district court erred in refusing to consider witness statements in the FDLE report indicating (among other things) that Redding had nothing in his hands (that is—was unarmed) when he fled from the police. We assume she is correct that the district court should have considered those statements, but we agree with the district court that it makes no difference. As we will discuss, the key question here is whether Popovich knew Redding

however, we agree with the district court that Popovich is entitled to qualified immunity, albeit for different reasons. We conclude, contrary to the district court's assessment, that there is no genuine dispute of fact that Popovich did not know Redding was unarmed. As the district court recognized, there is no evidence that Popovich knew Redding was unarmed. The mere fact that Redding *was* unarmed does not mean there is necessarily a fact dispute or credibility issue as to what Popovich knew, because a reasonable officer in Popovich's position could still have believed—in the split-second between Redding's sudden movement and the fatal shots—that Redding was still armed or had another weapon. Thus, Franklin has not shown a Fourth Amendment violation, and cannot point to any clearly established law holding that the use of deadly force was unreasonable in these circumstances.

"The qualified immunity doctrine protects an officer [from liability under § 1983] unless . . . the law was already established to such a high degree that every objectively reasonable officer in his place would be on notice that what he was doing was clearly unlawful given the circumstances." *Powell*, 25 F.4th at 920 (quotation omitted). "The doctrine protects all but the plainly incompetent or one who is knowingly violating the federal law."

---

was unarmed; none of the witness statements (which deal with what others saw) bear on that question.

The second argument is that the district court construed the facts *too* generously in Popovich's favor. As discussed below, and in footnote 7, we disagree.

*Id.* (quotation omitted). "For qualified immunity to apply, an officer must first establish that he acted within his discretionary authority." *Id.* (quotation omitted).[5] "Once the officer does that, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* (quotation omitted). "To overcome a qualified immunity defense where the defendant acted within his discretionary authority, the plaintiff must show that the defendant's actions not only [1] violated one or more constitutional rights, but also [2] that it was clearly established at the time that those specific actions did so." *Id.*

As discussed, Franklin's claim here is based on Redding's "Fourth Amendment right to be free from excessive force when [Popovich] fatally shot [Redding]." *Perez*, 809 F.3d at 1218.[6] The

[5] Franklin no longer contests, as she did below, that Popovich was acting within his discretionary authority.

[6] While Popovich does not separately argue that the district court erred in finding a genuine issue of material fact on the merits of the Fourth Amendment claim as such, he plainly disputes the conclusion that he knew Redding was armed, and he argues that this point drives the qualified immunity analysis. Thus, and because Franklin appeals the final judgment that Popovich is entitled to qualified immunity, the underlying question of whether Popovich violated Redding's constitutional rights is properly before us.

In *Coffin v. Brandau*, for example, the district court concluded that, while the defendants had committed a Fourth Amendment violation, the plaintiff had not shown their conduct violated clearly established law. 642 F.3d 999, 1003–04 (11th Cir. 2011) (en banc). After a panel of this court affirmed, we reheard the case en banc, addressing the merits of the alleged Fourth Amendment

Fourth Amendment forbids law-enforcement officers from making "unreasonable . . . seizures." U.S. Const. amend. IV. Under the Fourth Amendment, the "apprehension [of a suspect] by the use of deadly force is a seizure." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "An officer may use deadly force when he has probable cause to believe that the suspect poses a threat of serious physical harm[.]" *Powell*, 25 F.4th at 922 (internal punctuation omitted) (quotation omitted). Further, "proper application" of the Fourth Amendment to excessive force claims

> requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham v. Connor*, 490 U.S. 386, 396 (1989). "And to be clear, the inquiry is an objective one"—which is to say we ask "whether a reasonable officer in [Popovich's] position could have . . . concluded" that "the circumstances justified the use of deadly

---

violation as well as the clearly established prong of the qualified immunity analysis. *Id*. at 1009–13. We explained that "we are free to address the question of whether the facts that the plaintiff alleged showed a violation of a constitutional right or the question of whether the right at issue was clearly established in the order most appropriate for the case at hand." *Id*. at 1006.

Thus, in this case, we exercise our discretion to consider both the qualified immunity prongs, in order.

force[.]" *Harris-Billups ex rel. Harris v. Anderson*, 61 F.4th 1298, 1302 (11th Cir. 2023).

If a plaintiff demonstrates (here for purposes of summary judgment) a violation of his constitutional rights, he must then show that the right at issue was clearly established, which he can do in one of three ways. First, "by pointing to a materially similar decision of the Supreme Court, of this Court, or of the supreme court of the state in which the case arose[.]" *Powell*, 25 F.4th at 920 (quotation omitted). Second, "by establishing that a broader, clearly established principle should control the novel facts of the case[.]" *Id.* (quotation omitted). And third, "by convincing us that the case is one of those rare ones that fits within the exception of conduct which so obviously violates th[e] constitution that prior case law is unnecessary." *Id.* (quotation omitted). "Under the second and third methods, we look for 'obvious clarity'"—meaning "a principle or provision so clear that, even without specific guidance from a decision involving materially similar facts, the unlawfulness of the officer's conduct is apparent." *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1350–51 (11th Cir. 2002)). Under "all three methods, the salient question is whether the state of the law at the time of the incident gave the officer fair warning that his conduct was unlawful." *Id.* at 921 (alterations adopted) (quotation omitted).

Here, Franklin cannot meet her initial burden of showing a violation of Redding's constitutional right to be free from unreasonable (here, excessive) seizure. As the district court

explained, the underlying crimes for which Redding was being pursued were serious, violent felonies. Just moments before, and regardless of whether Redding continued to shoot while fleeing from police officers, Redding had exchanged gunfire with the police and possibly shot one of the officers. There is no evidence that Popovich knew that Redding was unarmed. Finally, and at the key moment, Redding could at least appear to a reasonable officer as resisting arrest by pulling his arms (voluntarily or involuntarily, and for whatever reason) away from the officers standing on them. Thus, the operative facts are that Redding made a sudden move after having engaged in a shootout and fled from police, at a time and place that Popovich could reasonably have believed Redding was still armed. That is not a Fourth Amendment violation. *See, e.g., Harris-Billups*, 61 F.4th at 1302–04 (holding that an officer did not violate the Fourth Amendment in using deadly force when "a reasonable officer could . . . have interpreted [the suspect's] sudden lurch as the commencement of yet another attack").[7]

---

[7] Having ascertained the operative facts under the appropriate standard of review, we reject Franklin's argument that the district court improperly accepted Popovich's version of the facts rather than her own. *See* footnote 4, above. Franklin charges, for example, that the district court "erred in . . . not considering Redding's reasonable versions" on such questions as (1) was Redding still armed; (2) "did he reach or 'violently' reach to his body" just before he was shot; (3) "should Popovich have verified his uncorroborated belief Mr. Redding was armed;" (4) "should [Popovich] have known or did he know that . . . Redding was not armed;" and (5) was Redding still a threat after being shot several times. But as we have explained, even if Redding was *in fact* unarmed (and several witnesses saw as much), a reasonable officer in

22-13326               Opinion of the Court                    15

The district court, for its part, reached the opposite conclusion on the theory that (for purposes of summary judgment) Popovich *did* know that Redding was still armed. The district court apparently thought that it was required to draw that inference simply because of "the mere fact that [Redding] was[, in fact,] unarmed[.]" In particular, the district court thought this raised "a credibility issue" that had to be resolved in Franklin's favor. We see the logic, but that conclusion is incorrect. Once again—there is no indication Popovich knew that Redding had dropped the weapon with which he fired on the officers,[8] and even if there were, Popovich had no way of knowing if Redding had another weapon before having searched him (which he had not yet done).

Thus, exercising our discretion to consider either prong of the qualified immunity analysis as appropriate to the circumstances of this case, *see Coffin*, 642 F.3d at 1006, 1009–13, we conclude that Franklin failed to show that Popovich violated Redding's Fourth Amendment rights.

---

*Popovich's* position could have believed that Redding was still armed. That point about knowledge is the key. Franklin's remaining disagreements with the district court's characterization of the facts—along with the statements in the FDLE report—do not change the state of play about what a reasonable officer in Popovich's situation would have known, so they do not materially change the analysis.

[8] This is not to say a suspect dropping a weapon can *never* give rise to a fact question about whether an officer saw it happen. We do not suggest, for example, that a suspect dropping a weapon in plain view of an officer could not create a fact question about whether the officer saw the suspect do so.

That being so, Franklin's remaining arguments fail. Franklin advances a few theories that Popovich violated Redding's clearly established rights but, properly construing the facts, none has merit. First, we agree with the district court that *Perez v. Suszczynski* is distinguishable because, in *Perez*, the evidence established that the suspect was disarmed, compliant, and non-resistant the entire time, whereas Redding actively resisted the officers throughout the encounter. *See* 809 F.3d at 1217. The same is true for *Hunter v. City of Leeds*, 941 F.3d 1265, 1280–81 (11th Cir. 2019) (where the suspect was just disarmed and did not make any sudden moves), and *Robinson v. Sauls*, 46 F.4th 1332, 1337–38 (11th Cir. 2022) (where the suspect was unconscious)—even setting aside that *Robinson* was decided well after the events at issue here and so could not serve to clearly establish the law. And to the extent that Franklin relies on the broader principle recognized in *Leeds* and cases like it, such cases do not apply to Popovich's conduct with "obvious clarity" because Franklin cannot show that Popovich *knew* that Redding was unarmed.

Thus, Franklin has also failed to show any case or broader principle that clearly established the illegality of Popovich's actions at the time of the shooting. Consequently, Popovich is entitled to qualified immunity.

## IV.    Conclusion

Because we agree with the district court's conclusion that Popovich is entitled to qualified immunity, the judgment of the district court is **AFFIRMED**.