[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10068

_____

JOSEPH HEID,

Plaintiff-Appellee,

*versus*

MARK RUTKOSKI,
FORREST BEST,

Defendants-Appellants,

JERRY L. DEMINGS, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-00727-RBD-DCI

_____

Before JILL PRYOR, GRANT, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

Orange County Sheriff's Deputies Mark Rutkoski and Forrest Best appeal the District Court's denial of qualified immunity in Joseph Heid's 42 U.S.C. § 1983 lawsuit. In his complaint, Heid alleges that Deputies Rutkoski and Best used unreasonable force in violation of the Fourth Amendment. Deputies Rutkoski and Best moved for summary judgment, asserting qualified immunity, but the District Court denied their motion. On appeal, they contend that the District Court erred in denying them qualified immunity because Heid failed to show they violated a constitutional right or that any such right was clearly established. After careful review, and with the benefit of oral argument, we reverse.

**I.**

The factual background of this appeal was the basis of a 2018 criminal trial in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida. The jury in that trial found Heid guilty of four counts: (1) Attempted Second Degree Murder of a Law Enforcement Officer, with a special finding that Heid actually discharged a firearm during the commission of the offense;

(2) Aggravated Assault on a Law Enforcement Officer; (3) Resisting an Officer with Violence; and (4) Resisting an Officer without Violence.  The jury instructions for the charge of Resisting an Officer without Violence specified that Heid resisted Deputies Rutkoski and Best, whom Heid now sues.

⋆          ⋆          ⋆

On the evening of April 26, 2016, Heid, his wife, and their roommate were drinking alcohol at their home.  Heid's daughter and stepson were also at the home.  Around 9:00 PM, Heid and his wife got into an "ugly" verbal argument, causing him to leave and walk to a nearby park for about an hour "to try to cool things."  He did not drive because he was not sure he could pass a breathalyzer test, and his wife said she would alert the police that he was driving under the influence.

Heid then returned to the house and resumed arguing with his wife.  This argument resulted in a physical altercation—Heid's wife put her finger in his face and he put his wife in a self-described "submission hold" by mouthing her finger without biting down or inflicting pain.  Heid's stepson observed this interaction and hit Heid in the back of the head.  Heid then pinned his stepson on the floor with his body weight and threatened to hurt him if he ever did that again.  Heid subsequently got off his stepson and left the house again for the nearby park.

While Heid was gone, the roommate called 911 and reported that Heid was physically fighting with his wife and tried to hurt his stepson.  The roommate called back several minutes later

to report there were about five guns in the house. Deputies Joseph Kramer and Johnerick Sanchez responded to the scene to investigate, arriving in separate cars. At the scene, the stepson relayed what had happened to him and his mother. Deputies Sanchez and Kramer left the residence and were searching a nearby park for Heid when the stepson found them and reported that Heid had returned to the residence.

Now back at the residence, Deputies Kramer and Sanchez placed Heid's wife—who was intoxicated and belligerent—in Deputy Kramer's car to facilitate their investigation. Everyone except Heid had left the house. Deputy Kramer requested additional units to assist, and Deputies Patrick Lewis and Best separately arrived at the scene as backup. Deputies Lewis and Best were briefed on the situation when they arrived. While Deputy Best watched the front door of Heid's residence, Deputy Lewis interviewed Heid's wife. Heid's wife told Deputy Lewis about Heid being intoxicated, biting her finger, choking and threatening to "murder" his stepson, and having multiple guns—including an AK-47—in the house. Deputy Lewis could see the marks that Heid left on his wife's finger. Deputy Best, after being relieved from his position, interviewed the stepson. The stepson repeated to Deputy Best that Heid had acted violently and that there were guns in the house.

Deputy Rutkoski, who was the Acting Corporal that night, was the last officer to arrive at the scene. Deputy Kramer informed him that: (1) Heid had hit his wife and choked his stepson; (2) based on information from Heid's wife and stepson, there was probable

cause to believe Heid had committed felony domestic battery by strangulation; (3) Heid had left the residence but went back inside; (4) Deputy Kramer called to Heid to exit the residence, but received no response; and (5) Heid had access to a gun safe in the house that contained five guns.

Deputy Rutkoski instructed Deputy Sanchez to go to the back of Heid's property to help establish a perimeter around the house. Deputy Sanchez determined the best vantage point was in the neighbor's backyard, so he stood on a stool looking over the neighbor's fence and into Heid's backyard. Deputy Best was stationed behind a patrol vehicle parked in the driveway in front of the garage attached to Heid's house. With these two officers in position, Deputy Rutkoski activated a patrol vehicle's public address system, identified himself as the Orange County Sheriff's Office, and ordered Heid to exit the house with his hands up.

Heid was not in the house, however. Allegedly oblivious to the ongoing police investigation, Heid was sitting in the backyard against a citrus tree, smoking cigarettes, and trying to calm himself down. He claims to have not heard Deputy Rutkoski's commands. Rather, he heard the rustling of leaves and saw Deputy Sanchez's flashlight on the other side of the fence. He thought the person with a flashlight was holding a gun and asked, "Are you going to shoot me?" Deputy Sanchez commanded Heid to keep his hands up and stop moving—which Heid also claims to have not heard—but Heid walked toward his back porch and entered his house.

6                    Opinion of the Court                    24-10068

While inside, Heid armed himself with a Winchester .32 caliber lever action rifle.

While Heid was walking to the house, Deputy Sanchez announced over the radio, "He's in the back!" Deputy Best ran through the front door of the house on his way to the backyard to assist but heard Deputy Sanchez announce over the radio that Heid was entering the house. Deputy Best immediately turned around and retreated back through the front door. Deputies Kramer and Lewis, however, ran to the backyard to check on Deputy Sanchez. They stationed themselves facing the backyard as Deputy Sanchez warned that there were guns inside the house.

Moments later, Deputies Rutkoski and Best heard a loud gunshot from the backyard, likely from a rifle or shotgun. They then heard dozens of gunshots over the next several seconds, including several that sounded like the first loud gunshot. Heid had fired in the direction of Deputy Sanchez, causing a gunfight to ensue in the backyard between Heid and Deputies Sanchez, Lewis, and Kramer.

Deputy Rutkoski knew that Deputies Sanchez, Kramer, and Lewis were all carrying .45 caliber pistols and thus he believed the loud gunshots were from Heid discharging one of the rifles or shotguns he kept in the house. Deputy Best said he heard gunshots within seconds of exiting the home. He also heard gunshots from both handguns and a rifle or shotgun, causing him to believe that Heid was shooting at the deputies in the backyard. Deputies Rutkoski and Best took cover behind a patrol vehicle parked in the

driveway. Once the gunshots stopped, Deputy Rutkoski asked over the radio whether the deputies were all right, and Deputy Sanchez said "10-4," indicating he was not injured. Deputies Kramer and Lewis did not respond, causing Deputy Rutkoski to fear they were shot and incapacitated.

Deputies Best and Rutkoski focused on the front entranceway to Heid's house. Heid's front door is in an alcove set back approximately five feet from the front edge of the attached garage, which sits immediately to the right of the door. Because the garage extends forward toward the street, it creates an L-shaped corner where its outer wall meets the entrance walkway and alcove. A driveway runs in front of the garage, and the patrol vehicle was parked askew across it, approximately ten yards from the garage. That layout—the recessed door, projecting garage, and angled vehicle—formed a visual barrier that obscured the front door from certain angles in the driveway. Deputy Best, taking cover near the vehicle's engine block, had a direct line of sight to the door. But Deputy Rutkoski, behind the vehicle's rear bumper, could not see past the corner.

A still image from Deputy Best's body camera demonstrates this configuration:



Approximately twenty seconds after taking cover, Deputy Best alerted Deputy Rutkoski that Heid was exiting through the front door. A moment later, Deputies Best and Rutkoski claim they saw an object thrown from the front door toward the patrol vehicle. Heid disputes that anything was thrown, and no such object is visible on the video recorded by a neighbor's surveillance camera. Nevertheless, according to Heid, before he opened the front door he began screaming, "I'm unarmed. I'm coming out. I'm surrendering. I give up." And he claimed that as he opened the door, he reasserted he was surrendering and unarmed. Neither of the deputies heard him make these statements.

Although the parties dispute the exact manner in which Heid proceeded through the entrance and toward Deputies Best and Rutkoski, the neighbor's camera captured Heid exiting the

front door area.  That video shows Heid exiting at a fairly rapid pace toward the positions of Deputies Rutkoski and Best.  And while it certainly does not show his hands up in a classic surrender position, it is not clear enough to indicate whether Heid's arms were in front of him, as Heid alleges, or swinging, as Deputies Rutkoski and Best claim.

Deputy Best observed Heid's approach and feared that Heid would continue the gunfight in the front yard.  Deputy Rutkoski only saw Heid once he cleared the corner of the garage, claiming Heid "closed on [his] position" in a "charge" movement.  He, too, feared that Heid intended to continue the gunfight.  Consequently, Deputy Rutkoski discharged his firearm fourteen times in rapid succession after Heid closed to within three or four feet of him.  Deputy Best simultaneously discharged his firearm five or six times.  The audio on a neighbor's cell phone video and Deputy Best's body camera confirm that the deputies were shooting for three to four seconds.  The shooting continued as Heid fell to the ground, and he was struck six times.  While on the ground, Heid briefly continued moving before ceasing and vocalizing his surrender.

## II.

Heid, now serving his sentence in a Florida prison, sued under § 1983 the Orange County Sheriff's Department, the Orange County Sheriff in his official capacity, and Deputies Rutkoski and Best in their personal capacities.  As relevant here, he claimed Deputies Rutkoski and Best violated his Fourth Amendment right to be

free from unreasonable searches and seizures by shooting him while he was unarmed and surrendering. Deputies Rutkoski and Best eventually moved for summary judgment, asserting qualified immunity.

The District Court denied qualified immunity to Deputies Rutkoski and Best, stating, "Viewing the evidence in the light most favorable to [Heid] and drawing all reasonable inferences in his favor, the Court determines there is a genuine factual dispute as to whether Best and Rutkoski unconstitutionally subjected [Heid] to excessive force in violation of clearly established law." *Heid v. Rutkoski*, No. 6:20-cv-727, 2023 WL 9190644, at *6 (M.D. Fla. Dec. 16, 2023). The Court cited Heid's facts as these: (1) Heid was unarmed as he exited the front door; (2) he came out of the door yelling, "I'm unarmed, don't shoot. I'm coming out. I surrender, I give up"; and (3) Heid was shot while on the ground. *Id.* The District Court found there was no indication, based on Heid's version of the facts, that he posed a risk to anyone when exiting the front door. *Id.*

The District Court also determined that clearly established law provided Deputies Rutkoski and Best sufficient warning that shooting Heid under these circumstances would constitute excessive force, citing *Robinson v. Sauls*, 46 F.4th 1332, 1345 (11th Cir. 2022). *Id.*

Deputies Rutkoski and Best timely appeal.

### III.

"We review de novo a grant of summary judgment based on qualified immunity, construing the facts and drawing all inferences in the light most favorable to the nonmoving party." *Franklin v. Popovich*, 111 F.4th 1188, 1193 (11th Cir. 2024) (internal quotation marks omitted). However, "we cannot ignore uncontradicted evidence," such as a video recording, "simply because it is unfavorable to [the non-moving party]." *See Fennell v. Gilstrap*, 559 F.3d 1212, 1215 n.3 (11th Cir. 2009), *abrogated on other grounds as recognized by Crocker v. Beatty*, 995 F.3d 1232, 1248 (11th Cir. 2021). If the non-moving party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it," we do not adopt that version of the facts. *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007).

"Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Franklin*, 111 F.4th at 1193–94 (internal quotation marks omitted).

### IV.

To obtain qualified immunity, the official asserting the immunity "must first prove that he was acting within his discretionary authority" when he performed the acts of which the plaintiff complains. *Bowen v. Warden, Baldwin State Prison*, 826 F.3d 1312, 1319 (11th Cir. 2016) (internal quotation marks omitted). There is no dispute that Deputies Rutkoski and Best were acting within the

scope of their discretionary authority when the allegedly wrongful acts occurred.  *See Robinson*, 46 F.4th at 1340.

The burden thus shifts to Heid to show: (1) the defendants violated a constitutional right; and (2) the right was clearly established at the time of the alleged violation.  *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).  We conduct a two-part inquiry to assess whether Heid met this burden.  First, we consider whether, taken in the light most favorable to Heid, the evidence shows that Deputies Rutkoski and Best violated a constitutional right—in this case, the Fourth Amendment right to be secure against unreasonable seizures.  *See Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871 (1989); *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016).  The touchstone of our analysis is therefore "the Fourth Amendment's requirement of reasonableness." *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 (11th Cir. 2019) (citing *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699 (1985)).

"Reasonableness is a fact-specific inquiry . . . ." *Id.* at 1279. We consider the reasonableness of the force used to effect a seizure "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S. Ct. 1868, 1879–81 (1968)).  And the inquiry turns on such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Garner*, 471 U.S. at 8–9, 105 S. Ct.

at 1699–1700).  As the Supreme Court recently confirmed, this analysis precludes "put[ting] on chronological blinders." *Barnes v. Felix*, 145 S. Ct. 1353, 1359 (2025).  "The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force." *Id.* at 1358.

Heid does not meet his burden of showing the violation of a constitutional right.  To begin, Heid had just engaged in a gunfight in the backyard with Deputies Sanchez, Lewis, and Kramer. Heid is collaterally estopped from relitigating whether he knowingly attempted to shoot Deputy Sanchez in his backyard because he was convicted in a Florida court of Attempted Second Degree Murder of a Law Enforcement Officer, with a special finding that he "did actually discharge a firearm during the commission of the offense." *See Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1328 (11th Cir. 2003) ("Collateral estoppel, i.e., issue preclusion, refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided.").  And though Heid claimed in his post-conviction civil deposition that he heard no police commands before that gunfight began, he is also estopped from relitigating whether he knowingly resisted the five officers as they executed their duties because of his convictions of Resisting an Officer with Violence and Resisting an Officer without Violence.

It is also undisputed that Deputies Rutkoski and Best reasonably believed the following information.  Heid was involved in a domestic dispute with his wife and stepson earlier in the evening—witnesses reported that Heid had bitten his wife, choked and

threatened to harm his stepson, and had multiple guns in his home. Heid resisted the officers. Heid then engaged in a gunfight in the backyard with Deputies Sanchez, Lewis, and Kramer, during which he attempted to murder Deputy Sanchez. Deputies Rutkoski and Best heard the backyard gunfight from their location in the front yard. In that gunfight, the deputies heard distinctive gunshots indicating that Heid was shooting a rifle or shotgun. Heid went into the house after the backyard gunfight, where there were more guns. Heid then came out of the front door around twenty seconds later, at a fairly rapid rate of speed.

A reasonable officer in Deputies Rutkoski's and Best's positions could have believed, in the split-seconds when Heid came out the door and only twenty-seven seconds after the backyard gunfight, that Heid was still armed or had gathered another weapon while inside the home. *See Franklin*, 111 F.4th at 1194 (holding that an officer may reasonably believe, based on the totality of the circumstances, that a suspect is armed and dangerous even if the suspect is ultimately determined to be unarmed). Deputies Rutkoski and Best simply "had no way of knowing if [Heid] had another weapon before having searched him (which [they] had not yet done)." *Id.* at 1196. They were not required to risk their own lives to apprehend a suspect they reasonably believed to pose great danger and who "up to that point, had shown anything but an intention of surrendering." *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (footnote omitted).

24-10068                Opinion of the Court                15

And it makes no difference whether Heid's arms were out in front of him as he claims, or swinging by his side as Deputies Rutkoski and Best represent. Accepting Heid's version of the facts that he vocalized his surrender and had his arms out in front of him, his body movements caught on the neighbor's video camera are not consistent with the claim that he was obviously surrendering.[1] Importantly, Heid's arms were not over his head with palms open in a classic surrender position. The officers had no way of knowing whether Heid was telling the truth, and Heid's physical actions belied his alleged assertions. Although Heid was ultimately shown to be unarmed as he came out of the front door, there is no genuine issue of material fact as to whether Deputies Rutkoski and Best—based on the video evidence and the information they had at that point—knew that Heid did not possess any weapons. *See Franklin*, 111 F.4th at 1194. Further supporting the reasonableness of the officers' actions was the fact that Heid advanced close to the positions of Deputies Best and Rutkoski, appearing suddenly from behind a blind corner in the seconds immediately preceding the shooting.

Critically, all of these events happened in a short period of time. *See Graham*, 490 U.S. at 396–97, 109 S. Ct. at 1872 ("The calculus of reasonableness must embody allowance for the fact that

---

[1] Deputy Best's body camera captures a few, indistinguishable words from Heid. We will not attempt to guess what Heid actually said (or whether Deputies Rutkoski and Best could understand these vocalizations), instead crediting his assertion that he made vocalizations of surrender.

police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). "[I]n circumstances that are tense, uncertain, and rapidly evolving" we cannot dismiss the fact that Deputies Rutkoski and Best were "required to make split-second judgments" about the amount of necessary force. *See Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) (internal quotation marks omitted). And Deputies Rutkoski and Best, twenty-seven seconds after Heid's gunfight with the other officers and his flight into a house containing multiple firearms, were not required "in a tense and dangerous situation to wait until the moment [Heid] use[d] a deadly weapon to act to stop [Heid]." *See Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). Their use of force to effect Heid's seizure was reasonable.

Moreover, the use of force in the split-seconds after Heid fell to the ground was not excessive force. Deputies Rutkoski's and Best's use of force lasted only three to four seconds in total, until they were fully aware that Heid had fallen to the ground and ceased his movements. They were "not required to interrupt a volley of bullets until [they] knew that" Heid was not armed and no longer posed any danger. *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 822 (11th Cir. 2010). This is not a case where the deputies believed Heid was unresponsive and no longer a threat, yet continued shooting him. *Cf. Robinson*, 46 F.4th at 1342–44 (determining officers used excessive force by shooting a suspect twenty seconds after a flashbang revealed that the suspect was unconscious). Nor can Heid's prior violent conduct be chronologically severed from his exit of

the house to limit the inquiry into the reasonableness of Deputies Rutkoski's and Best's actions. *See Barnes*, 145 S. Ct. at 1360 ("[A] court cannot thus 'narrow' the totality-of-the-circumstances inquiry, to focus on only a single moment. It must look too, in this and all excessive-force cases, at any relevant events coming before."). In these tense circumstances, it was not unreasonable for Deputies Rutkoski and Best to very briefly continue using force after Heid fell.

Consequently, Deputies Rutkoski's and Best's use of force against Heid was reasonable and did not violate the Fourth Amendment. Because we conclude that Deputies Rutkoski and Best did not violate any constitutional right, we do not reach the issue of whether such right was clearly established.

## V.

Because Deputies Rutkoski and Best did not violate Heid's Fourth Amendment rights, they are entitled to qualified immunity. The judgment of the District Court is reversed.

**REVERSED AND REMANDED.**